SUSAN M. LaCAPRIA, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
La Capria v. Commissioner
Docket No. 3405-80.
United States Tax Court
T.C. Memo 1983-5; 1983 Tax Ct. Memo LEXIS 785; 45 T.C.M. (CCH) 463; T.C.M. (RIA) 83005; January 4, 1983. Frank A. Marciello, Jr., for the petitioner. Maureen T. O'Brien, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined deficiencies in petitioner's Federal income taxes and additions to tax as follows: Addition to Tax
Year
Deficiency
Sec. 6653(b) [1]
1973
$4,769.24
$2,384.62
1974
4,250.06
2,125.03
1975
8,713.40
4,356.70
1976
3,325.86
1,662.93
*786 Due to concessions, the issues remaining for decision are 1) whether petitioner embezzled substantial amounts of cash from her employer which she failed to report in each of the years before the Court, 2) whether petitioner is liable for the additions to tax under section 6653(b) and 3) whether the statute of limitations as to each year has expired. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation and exhibits attached thereto are incorporated herein by reference. Petitioner Susan M. LaCapria resided in Medford, Massachusetts, at the time the petition was filed. Petitioner was employed by Erickson Fuel Company, Medford, Massachusetts, from 1966 through November 1, 1977. Erickson Fuel Company is a heating oil company servicing residential and, to a lesser extent, commercial properties and installations. For many years Erickson Fuel Company was operated as a sole proprietorship owned by Carl A. Erickson, Sr. (hereinafter "Carl, Sr."). Carl, Sr.'s children, Carl A. Erickson, Jr. (hereinafter "Carl, Jr.") and Alva Erickson (hereinafter "Alva") assisted their father in the business. At one time Carl, Sr. managed the affairs of the company. However, *787 during 1970, 1971 and 1972, Carl, Sr.'s participation in the company's business gradually diminished and Carl, Jr. became the dominant force in the company. From 1973 through 1976, Carl, Sr. lived most of the year at a house on Cape Cod. During this period, Carl, Sr. occasionally traveled to Medford and assisted Carl, Jr. in making deliveries and service calls during company busy periods. Carl, Sr. had no hand in the financial dealings of Erickson Fuel Company during the years in question. His work for his son was uncompensated from 1974 through 1976. In 1977, Carl, Sr. worked for the business as a paid part-time employee. On January 1, 1975, Erickson Fuel Company was incorporated under Massachusetts law. Carl, Jr. became sole shareholder and President. A substantial gift tax was paid in connection with the incorporation. Although during the years before the Court, Carl, Jr. supervised the operation of the business, Alva was the person who kept the company's books and managed its financial affairs. In 1975, Erickson Fuel Company had gross sales of approximately $1.3 million. The company at any one time between 1973 and 1976 employed four to eight men as oil delivery *788 truck drivers. The company also employed several individuals as office employees at its main office on Boston Avenue in Medford. Petitioner was the sole full-time office employee at the company's Boston Avenue office.Her duties consisted of answering telephone calls, dispatching oil trucks, accepting customer payments made in person or by mail at the Boston Avenue office, issuing receipt slips, updating customer accounts and totaling receipts at the end of each day. In short, petitioner was in charge of the office, but was occasionally assisted in her duties by two part-time workers: Loretta Lennon and Caroline Rousay. Loretta Lennon is one of petitioner's daughters. Caroline Rousay is Carl, Sr.'s sister. Erickson Fuel Company received payments for its fuel deliveries in several different ways: Most often, customers paid their fuel bills by mail, through a check or money order. Sometimes customers paid the delivery truck man at the time of receiving the delivery. Occasionally, customers paid their bills at the Ericksons' residence on Willis Avenue in Medford (at which Carl, Jr. and Alva and sometimes Carl, Sr. lived during 1973-1976). When bills were paid in these last two *789 ways, small pocket-sized receipts were written up and the customer's invoice was marked "paid." A fourth way customers paid their fuel bills was to appear in person at the company's Boston Avenue offices. There the customer would pay his bill either by cash, check or money order. Petitioner or another office worker would take the payment and record it in a special receipt book used only for walk-in customers. These receipt books each contained 126 sequentially numbered receipts -- e.g., 32395 to 32520 or 32773 to 32898. In addition to the original receipts (on white paper), the book contained yellow and pink sheets of self-carbonating paper on which copies of each original receipt would be reproduced. The office employee accepting the payment would note on the receipt the date, the name of the customer, the amount of the payment and the mode of payment (i.e., cash, check or money order). The employee would then initial the receipt and place the original receipt (the "white copy") in a desk drawer behind the counter along with the payment. The yellow copy of the receipt would be handed to the customer for his records. The pink copy was left in the book. After a receipt book *790 was completely used up it would be placed in the bottom drawer of an office file cabinet.When the file cabinet drawer became filled with used books, the contents of the drawer would be placed into a cardboard box and the box would be moved to a storage area. When a receipt book for walk-in customers was begun, it was generally used in chronological and numerical order until all blank receipts in it had been used. After a book was finished, however, it was common practice for the office employees to pull out any handy unused book -- i.e., not necessarily the book whose receipt numbers immediately followed the numbers of the used book -- and begin using the receipts in this new book in chronological and numerical order. At the end of each day, petitioner or one of the other office employees ran an adding machine tape of the walk-in payment receipts contained in the desk drawer. After subtotaling to determine the amount of all walk-in receipts received, the amount of all checks and money orders on hand from these payments would be subtracted. The remaining figure would represent the amount of cash that should have been in the desk drawer. During the period 1973 to 1977, petitioner *791 often initialed this nightly adding machine tape (she almost invariably did so in the later years). Other office workers occasionally initialed this tape (usually in conjunction with petitioner) during this period. Before locking up the office to go home, petitioner would leave the walk-in receipts, adding machine tape and money on a counter in a back room of the office. After closing, Carl, Jr. usually stopped by the office to pick up these items and take them home. Alva worked during the day as a secretary in the clerk's office of the Medford Police Department. At night, Alva would review the adding machine tape, receipts and payments of Erickson Fuel Company at the Willis Avenue residence. In particular, Alva would run an adding machine tape in the same manner as the office did for the walk-in payments. If any mistake on the office tape was revealed by the tape prepared by Alva, the next morning Alva would return the office tape along with Alva's tape to petitioner, pointing out the mistake. Alva also counted the cash from the walk-in customers to see that it matched the bottom figures on the tapes. Until the time petitioner ceased working at Erickson Fuel Company, no *792 significant or unexplained discrepancies between the office tape and the receipts and monies turned in were found. At the same time she checked the accuracy of the office's walk-in payments, Alva dated the office adding machine tape and wrote on the tape the sequence (or sequences) of receipt numbers turned in. Unless a discrepancy was revealed, Alva destroyed her own adding machine tape. Alva was responsible for making all deposits of cash, checks and money orders received by Erickson Fuel Company (whether received by mail, by the drivers, by the Ericksons at home or from the walk-in customers at the main office). After going over the receipts, tapes and payments each night, Alva left the original walk-in customer receipts with her brother. Carl, Jr. eventually returned these receipts to the main office to be filed by petitioner and her assistants in the appropriate customer's folder. One of petitioner's responsibilities was to continually examine customer folders to see that fuel bills were being paid currently. If there was no evidence of payment of a past due bill in a folder, petitioner attempted to contact the customer by telephone. On June 24, 1977, Carl, Jr. *793 was recovering from an operation and so that evening Alva went to the company offices to pick up the office's receipts, payments and tapes. On her way out of the office, Alva noticed two receipt books for walk-in customers near the front counter where normally, she felt, there should only be one book. She examined the two receipt books and the tape, receipts and payments which had been turned in that evening and discovered that while she had all the receipts and payments dated June 24, 1977, from one receipt book, she had none of the receipts and payments dated June 24, 1977, from the other book. Further examination revealed that the book containing the turned in June 24, 1977, receipts also contained pink-copy receipts dated between June 13, 1977, and June 23, 1977, for which white original receipts had not previously been turned in. All the pink-copies of these receipts not turned in were initialed by petitioner and indicated cash as the mode of payment.
The following Monday, Alva approached petitioner at work, presented her with the checks, receipts and books and asked for an explanation. Petitioner asked Alva to leave the items with her and stated that she would check them *794 and get back to Alva, but she did not. Alva again contacted petitioner on Tuesday. On Tuesday evening, Alva went to petitioner's house at petitioner's invitation, at which time petitioner gave Alva $1,152.08 in cash, representing the total amount of the receipts which had not previously been turned in to the company as revealed by the two books. Petitioner asked Alva for a receipt for the items, which was given. A comparison of the receipt obtained by petitioner from Alva with the two books found by Alva on June 24, 1977, reflects the following: Receipt Date
Receipt Number
Exhibit
Amount
5/24/77
32776
24-V
VOID
6/13/77
32773
24-V
$322.76
6/14/77
32774
24-V
74.65
6/14/77
32775
24-V
58.70
6/15/77
32777
24-V
72.33
6/17/77
32778
24-V
64.12
6/17/77
32779
24-V
52.83
6/22/77
32781
24-V
71.34
6/23/77
32782
24-V
56.86
6/23/77
32423
23-U
151.07
6/24/77
32424
23-U
88.64
6/24/77
32425
23-U
80.90
6/24/77
32426
23-U
57.88
Thus, the receipts on petitioner's list covered a period from May 24, 1977, to June 24, 1977. Prior to June 24, 1977, the receipts in the book with the serial number beginning 32773 were not *795 reflected on the daily adding machine tapes on the dates listed on those receipts. Prior to June 23, 1977, the receipts in the book with the serial number beginning 32395 were reflected on the daily adding machine tapes on the dates listed on those receipts. When petitioner gave the money to Alva, petitioner stated that she had stolen the money in anger in response to a perceived slight from the Ericksons. Vincent Sabbia, a licensed public accountant, was retained by Erickson Fuel Company in the fall of 1975 to analyze the company's financial operation and prepare year-end financial statements and tax returns. Sabbia prepared Erickson Fuel Company's 1975 Corporate Income Tax Return on the cash method of accounting based upon an examination of the receipts book, general ledger, general journal and bank statements. In February, 1977, he was advised that said return was being examined by the Internal Revenue Service. The audit began in April, 1977. The Revenue Agent, Albert Cuoco, eventually proposed a change in method of accounting from the cash to the accrual method. This change was agreed to by the company. With respect to the change in accounting method, Sabbia prepared *796 a spread sheet in April and May of 1977 that reflected a 1976 operating loss of $62,000. Sabbia advised Erickson Fuel Company and Revenue Agent Cuoco of his findings prior to petitioner's admission that she had withheld receipts from the company. When Alva discovered petitioner's defalcation on June 24, 1977, she immediately made the theft known to the Revenue Agent. After petitioner's admission to Alva, Sabbia requested that a review be done to determine if any other receipt books were unaccounted for. The officers of Erickson Fuel Company cooperated with the investigation by the Internal Revenue Service and Sabbia. Once he reviewed the spread sheet prepared by Sabbia and determined that the gross profit percentage was out of line, Revenue Agent Cuoco arranged to review Erickson Fuel Company's records at its offices. Within a few days after petitioner's admissions, Alva prepared a list of used and unused office receipt books. The list was made up of numerical sequences of the receipt books of Erickson Fuel Company. To the right of the serial number where either the dates the book was used or the word "missing," if the book was not in the possession of the company. Spaces *797 also indicated books not in the company's possession. Of the approximately 275 receipt books known to have existed at sometime, approximately 10 percent could not be located. The receipts contained in the books labeled missing were not reflected on the daily tapes. Alva gave the above lists to respondent's agent who used them while examining each customer's account folder for the years at issue. In each instance when the agent found an original walk-in receipt whose number was from a missing book, he would remove the receipt and leave it with the Ericksons to photocopy and mail to him at a later date. Eventually, over 1,200 original walk-in customer receipts were pulled from the customer folders. Each of these receipts was initialed "SLC" by petitioner and indicated cash as the mode of payment. The receipts bore dates indicating that the missing books were used simultaneously with books whose receipts were all turned in to the company.None of the receipts removed from the customer files had been included on the daily adding machine tapes prepared at the company offices. Some of the receipts from the missing books bore dates when, according to payroll records, petitioner was *798 the only employee in the office (i.e., when other office help was on vacation). Revenue Agent Cuoco did not find any other instances of unreported income and was satisfied that, except for income reflected on the newly discovered receipts, all income and expenses had been reported by the company. On November 1, 1977, petitioner was called from her work in the front of the office to a meeting being held in the office back room. Carl, Jr., Sabbia and two revenue agents were there. When petitioner entered the room she was questioned about the receipts from the missing books and the absence of adding machine tape entries. She denied having stolen any money beyond the $1,152.08 in June, 1977. She gave no explanation for the discrepancies, but told the revenue agents they could look at her bank accounts anytime. She said she felt she was being accused and told Carl, Jr. that she quit and they should see her lawyer if they had any further questions. Revenue Agent Cuoco prepared a fraud referral on petitioner's individual return for the years 1975 and 1976 on the basis that he had receipts with her signature which were not turned over to Erickson Fuel Company, adding machine *799 tapes with her signature and the fact that she was unable to explain why the receipts were not reflected on the tapes. Petitioner, Carl, Jr. and Alva all allowed the I.R.S. to examine their respective bank accounts to locate the missing cash. No unusual bank account activity was uncovered. On March 31, 1978, Special Agent Kenneth Kolben (hereinafter "Kolben") issued a summons to the branch of the Shawmut County Bank at which petitioner maintained a savings account. The summons sought the production of records relating to petitioner's account(s) at the JFK Federal Building in Boston on April 18, 1978. Carol Colangelo, another of petitioner's daughters, was manager of the bank branch to which the summons was sent. On April 18, 1978, Carol Colangelo and petitioner arrived with petitioner's lawyer at the JFK Federal Building. At this meeting with Kolben petitioner's lawyer suggested that they all go straight to petitioner's bank and look at the contents of her safe deposit box. An examination of the safe deposit box, owned jointly by petitioner and Carol Colangelo, revealed no significant sums of money or other valuable assets. A record card on which the date of each use of *800 the box was recorded showed that the box had been opened roughly 20 times, mostly by Carol Colangelo, during the period from January, 1975, through April 18, 1978. The box had last been opened April 3, 1978. None of the items in the box appeared to relate to Carol Colangelo. At some time previous to the above described events, petitioner had complained about her working conditions and hours, yet when Carl, Jr. suggested the installation of a computer, petitioner stated that she would quit if a computer was put in the office. For the period November 16, 1973, to January 1, 1974, petitioner did not work at Erickson Fuel Company due to a back injury. Petitioner worked part-time to November 1, 1974, when she resumed her full-time schedule. Petitioner was not at work, either through illness or while on vacation, during the following periods: November 16, 1973 - January 1, 1974 July 21 - July 27, 1974 August 5 - August 14, 1975 September 30 - October 4, 1975 August 8 - August 13, 1976 No receipts were withheld during the above periods.
In preparing the tape for the walk-in customers' receipts, petitioner would generally initial the tape. This practice was generally *801 followed during the years 1975 and 1976. The initials "SLC" are the petitioner's. Receipts totaling $15,085.91, $13,206.74, $23,256.65 and $10,891.88 for the years 1973, 1974, 1975 and 1976 were never handed in to the company nor reflected on the daily adding machine tapes. All such receipts contain the petitioner's initials and reflect cash transactions. At no time was the petitioner instructed or asked to withhold receipts by another person. By a deed dated July 20, 1977, and recorded in the Middlesex County Registry of Deeds, petitioner transferred her interest in her residence to her daughter, Carol Colangelo and son-in-law. Carol Colangelo had married during the year 1972. In response to an inquiry by the Special Agent as to why there were so many safe deposit box entries over the period from January, 1975, through April 18, 1978, Mrs. Colangelo stated that it was because of her name change. Petitioner's tax returns for 1973 through 1976 were prepared by Orlando DeThomas, certified public accountant. On these returns petitioner reported the following items of gross income: 1973
1974
1975
1976
Erickson Fuel Co.
$9,932.00
$6,792.60
$12,669.00
$12,284.00
Interest
206.88
186.31
177.14
70.29
*802 When her return preparer asked her if she received any other gross income in each of these years, she said "no." From 1973 through 1976, petitioner and her daughter, Carol Colangelo, lived rather frugally. They took no extended vacations and made no expensive purchases inconsistent with their reported incomes. At no point have the Ericksons sought restitution of such monies they contend petitioner embezzled. In January, 1978, Alva broached the subject of a criminal prosecution of petitioner with the District Attorney, but he declined to proceed with the matter. Alva did not institute a criminal complaint against petitioner on her own. Respondent mailed the statutory notice of deficiency to petitioner for all four taxable years (1973-1976) by certified mail on December 28, 1979. On October 2, 1978, petitioner signed a form consenting to the extension of the statute of limitations for the taxable year 1975 to December 31, 1979. ULTIMATE FINDINGS OF FACT Petitioner embezzled $15,085.91, $13,206.74, $23,256.65 and $10,891.88 from Erickson Fuel Company during the years 1973, 1974, 1975 and 1976, respectively, which she failed to report on her returns for said years and *803 such failure was due to fraud. OPINION This case consumed over two days of trial time, during which the Court had ample opportunity to observe the demeanor of the various witnesses, including petitioner, Alva and Carl, Jr. We have carefully considered all of the testimony and other evidence in this case, and are convinced that petitioner embezzled $15,085.91, $13,206.74, $23,256.65 and $10,891.88 from Erickson Fuel Company during the years 1973, 1974, 1975 and 1976, respectively. It is undisputed that such funds were not reported on petitioner's federal income tax returns for said years. Embezzled income is taxable and must be included in a taxpayer's gross income. . Such income is reportable in the year or years of embezzlement unless restitution is made during the respective years thereof, which is not the case here. ; see also . Petitioner was a trusted employee of Erickson Fuel Company from 1966 through late 1977, including the years in question. She knew the office procedures and *804 was in effective control of the Boston Avenue office collection operations. As such, she had control over and access to customer account files and payments received from walk-in customers. She had responsibility for preparing the summary tape of walk-in customer payments at the end of each day. Petitioner admits that she withheld receipts from Erickson Fuel Company in June, 1977, in the amount of $1,152.08. She insisted that this embezzlement happened on the spur of the moment and only on one day. However, petitioner produced a receipt which, when compared with the receipt books involved, clearly indicates that the admitted embezzlement began on June 13, 1977, and continued through June 24, 1977. Petitioner's testimony as to the circumstances surrounding the discovery of the June embezzlement is contradictory. On two occasions petitioner insisted that she admitted the embezzlement to Alva Erickson on Monday morning. Later petitioner stated that she did not admit the embezzlement in the morning but rather on Monday night. However, Alva testified that she had to approach the petitioner on both Monday and Tuesday mornings and on neither occasion did petitioner admit to taking *805 the money. Petitioner insisted that she returned the money on Monday night. However, this testimony is contradicted by the receipt introduced by petitioner which is clearly dated June 28, 1977, a Tuesday. In addition, the testimony of Alva supports the conclusion that the money was returned on Tuesday. Petitioner's explanations as to why she took the money are also contradictory. On the stand, petitioner testified that she was angry at the Ericksons for pulling up some hedges, leaving gravel between her property and the Erickson's four or five months earlier, and the failure to fix a new boiler. However, Carl Erickson, Jr. testified that petitioner had complained about the way a driveway was installed on the Erickson's property and as a result of the complaint a fence was installed and white landscape stone was installed on both sides of the fence during 1976. Petitioner never complained to Carl, Jr. concerning the fence and stone and in fact had agreed with her daughter to share in the cost of installation. Petitioner's explanations are not plausible, since the events complained about occurred months earlier and the facts show that she had agreed to the fence installation *806 and in fact offered to pay her share. Petitioner's explanation as to why she took the money is further contradicted by prior inconsistent statements. Petitioner told Alva on June 28, 1977, the date of petitioner's admission of guilt, that she took the money because she was mad at one of the Ericksons for saying she was just like any other employee. On April 18, 1978, petitioner told Special Agent Kolben that she had taken the money because she was angry because Carl, Jr. had failed to fix her daughter's leaky radiators. It is apparent that the same methodology was used in both the June, 1977, incident and the embezzlement during the years 1973 to 1976. All of the slips in the June incident were prepared by petitioner and were for cash payment and none of the tapes for the days involved reflect those receipts. Most of the tapes for the days are initialed by petitioner. The discovery of the embezzlement resulted because petitioner made a mistake in her own fraud. Petitioner withheld from the receipt book that was introduced into evidence as Exhibit 24-V, receipts from June 17, 1977, to June 23, 1977. Petitioner turned in receipts from another receipt book, Exhibit 23-U, *807 from June 20, 1977 to June 23, 1977. The last receipt turned in on June 23, 1977, from Exhibit 23-U was 32422. Petitioner took the money from the last slip 32423 in Exhibit 23-U on June 23, 1977, and mistakenly continued to withhold receipts from that book on June 24, 1977. The receipts from exhibit 24-V for June 24, 1977, were mistakenly turned in to the company. This establishes that the petitioner was working with two receipt books at once -- one for herself, and one for the company, and that she made a mistake on June 23, 1977, by taking the last receipt from Exhibit 23-U. In other words, petitioner lost track of which book was hers and which was the company's, and sealed the downfall of her scheme by leaving the two books in a place where Alva could find and compare them. All of the receipts for the years 1973 to 1976 which are involved in this case (hereinafter "missing receipts") are for cash payments and initialed by the petitioner. None of these missing receipts are listed on the adding machine tapes, many of which were prepared by petitioner, and all are from books listed as missing. It is clear that the same method was used during the years 1973 to 1976 as in petitioner's *808 admitted June, 1977, embezzlement. Petitioner has admitted that she was not instructed by anyone to withhold receipts. Petitioner's involvement in embezzlement during the years 1973 to 1976 is also established by the fact that no receipts were withheld during the periods petitioner was not working. She did not work from November 16, 1973, to January 1, 1974. There are no missing receipts during petitioner's vacation from August 19 to September 1, 1973. Again, when petitioner was on vacation from July 21 to July 27, 1974, there are no missing receipts. With the exception of one receipt on August 15, 1975, there are no missing receipts for the vacation period August 10, to August 15, 1975. This discrepancy can be explained, however, since the payroll record indicates petitioner received an additional overtime check for that period. Petitioner may have begun vacation the previous week, since no slips are missing from August 5 to August 14, 1975, thus creating the possibility, at least, that petitioner actually worked on the last day of her vacation period. Again during the period September 30 to October 4, 1975, there are no missing receipts. During the vacation period of August *809 8 to August 13, 1976, there are no missing receipts. The only other office employee who was employed by the company throughout 1973 to late 1977 was petitioner's daughter, Loretta Lennon. Mrs. Lennon did not work from June 15 to August 9, 1973, yet there are missing slips during this period. Nor did Caroline Rousay work during this period. It is clear that petitioner was the only office employee who was working at all times when there are missing receipts and there are no missing receipts during the period petitioner was out of work except for the one instance noted above, which is explainable. Petitioner was unable to explain the discrepancies between the tapes bearing her initials and the receipts for the same dates bearing her initials, but which were not listed on the tapes; nevertheless, she admitted only one tape was made per day. She also stated that receipts were generally used in sequence. However, the missing receipt numbers do not generally run in sequence but rather jump around from day to day. She testified that only one book at a time was used, yet when the missing receipts are compared with the daily tapes, it is obvious that more than one book at a time was *810 used. Petitioner's own testimony as to office procedures and her failure to explain these deviations strongly militates against her staunch denial that she embezzled the funds throughout the years in question. In addition, prior to June, 1977, petitioner threatened to quit if Erickson Fuel Company installed a computer in the office and refused to compile totals on the accounts receivable ledgers and account files. Yet she had never shown reluctance previously to perform requested duties. It is reasonable to infer from petitioner's reaction to the proposed introduction of a computer and her refusal to perform the significant requested tasks that she realized, under the circumstances, that her embezzlement would have been discovered. There was testimony that prior to the spring of 1977, no summaries or examinations of customer account files had ever been made.
To summarize, petitioner had control over the office, all the missing receipts were initialed by her and made out to cash, no other office employee was working during the entire period of missing receipts and, with one possible exception, there are no missing receipts while she was not working. In addition, petitioner's *811 explanation of the events of June, 1977, was convincingly contradicted by other credible witnesses and she gave implausible reasons for taking those funds which she admitted taking. She resisted work assignments and changes in office procedures which would have lead to a discovery of the embezzlements, and failed to explain discrepancies between the tapes and receipts prepared by her. All these facts taken together convince us that petitioner embezzled the aforementioned funds from Erickson Fuel Company throughout the years in question. Since respondent has established to our satisfaction that petitioner in fact perpetrated the embezzlements which she did not report and since the amounts thereof are not questioned, we hold that petitioner is liable for tax on $15,085.91, $13,206.74, $23,256.65 and $10,891.88 for 1973, 1974, 1975 and 1976, respectively, these amounts representing the totals of the undisclosed receipts during the years in question. We further hold that petitioner's failure to report the foregoing amounts in the years 1973, 1974, 1975 and 1976, respectively, was due to fraud in each such year. Section 6653(b) provides that if any part of any underpayment of tax *812 required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. . To prove fraud, respondent must show that the taxpayer acted with the specific intent to evade a tax believed to be owing. . Fraud may not be presumed or imputed; however, since direct evidence of fraud is seldom available, respondent may meet his burden of proof through circumstantial evidence. . In the instant case there are several indicia of fraud. First, there is petitioner's consistent and substantial understatements of income occurring over four years. . Second, there is petitioner's lack of any books and records relating to this income. . Third, petitioner has concealed the location and expenditure *813 of the embezzled income and made misleading statements both to respondent and at trial in an attempt to portray her admitted defalcation in June, 1977, as an isolated, one-day affair. . Finally, it is a legitimate inference that an individual who will embezzle from her employer will conceal such receipts from the government with the intent to evade tax. , affd. . For all the above reasons, we conclude that respondent has proved by clear and convincing evidence that petitioner's underpayments in 1973, 1974, 1975 and 1976 were due to fraud. Accordingly, the additions under section 6653(b) in those years are sustained. Petitioner has raised the issue of the statute of limitations for each year in issue. In light of our conclusions above as to the issue of fraud in each year, we hold that under section 6501(c)(1) none of the determined deficiencies is time barred. Furthermore, we have found as a fact that petitioner extended the limitation period for 1975 by a properly executed consent thereto, and the deficiency *814 notice for all four years was mailed within the period of limitations for each such year. To reflect the foregoing Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩